IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 1, 2008

## STATE OF TENNESSEE v. DEONTA BASKIN

**Direct Appeal from the Criminal Court for Shelby County**
No. 06-02027    James C. Beasley, Jr., Judge

No. W2007-00909-CCA-R3-CD  - Filed August 12, 2008

The defendant, Deonta Baskin, was convicted by a Shelby County jury of attempted first degree murder, a Class A felony, and aggravated assault, a Class C felony, for shooting a man in the hip following an altercation. The trial court merged the aggravated assault conviction into the attempted murder conviction and sentenced the defendant as a Range I offender to twenty-four years in the Department of Correction. On appeal, the defendant challenges the sufficiency of the evidence in support of his attempted murder conviction, arguing that the State failed to present sufficient proof that the shooting was premeditated. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); and Michael Johnson, Assistant Public Defender (at trial), for the appellant, Deonta Baskin.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William L. Gibbons, District Attorney General; and Pamela Fleming, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On August 1, 2005, the victim, Alvis Cross, interrupted an argument in his Memphis home between the defendant and the defendant's girlfriend, Sheretta Graffread, who lived with the victim and his fiancée. The victim ordered the defendant to leave the premises, and a verbal altercation ensued between the two men. The defendant eventually left but only after threatening that he would return and "wet this place up." Thirty to forty-five minutes later, the defendant returned and, after

exchanging shoves with the victim, pulled out a gun and fired one shot, striking the victim in the hip. The defendant was subsequently indicted and tried on one count of attempted first degree murder and one count of aggravated assault.

At trial, the victim testified that on August 1, 2005, he was living in a house on Boxwood in Memphis with his fiancée, Rhonda Ross; their daughter, Riara; his fiancée's cousin, Sheretta Graffread; and another woman who was a friend of Graffread's. He said that he and Ross were in their bedroom when they heard the sound of fighting, went outside to investigate, and encountered the defendant with Graffread in the hallway. He had seen the defendant, whom he knew only as "Dee," twice before and knew that he was dating Graffread. He and Ross both told the defendant to leave, and the defendant went outside. The victim went to the bathroom, but when he returned, he overheard Ross saying something to the defendant outside. "Being a man," he "spoke up," calling the defendant "a bitch." The defendant, who was standing on the sidewalk outside the victim's gate, called the victim "a bitch" in return and then left.

The victim testified that he then sat outside to drink a beer with his friends. Approximately thirty to forty-five minutes later, he saw the defendant, who appeared calm, walking back toward his house. Believing that he was coming to apologize, the victim got up and met him at the gate. The defendant, however, pushed him. He pushed back, and the defendant brandished a gun. He told the defendant to put the gun down and "fight like a man." Instead, the defendant raised the gun, and the victim "kind of hit his hand and [the defendant] shot [him]" in the upper hip. The victim fell to the ground as the defendant fled the scene.

The victim testified that the bullet fractured his hip bone, causing a single entrance wound but two separate exit wounds. He said he told the police officers who responded to the scene that his name was "Edward Weeks" because he had been raised in the foster care system, had gone to school under that name for years, and was confused about his true name. He stated that Ross's uncle, Howard, later contacted him in an attempt to bribe him in connection with his testimony and that he informed the district attorney's office of the potential bribe and provided them with Howard's telephone number.

On cross-examination, the victim denied that he initially refused to cooperate with the police or that he gave them a false description of his assailant. He conceded that he knew there was an outstanding warrant for his arrest at the time he was shot but denied it was the reason he told the police his name was Edward Weeks. He further conceded that he had given a false name to the police in the past when caught driving without a valid license. In contrast to his direct examination testimony, he said that, while close, he had turned sideways and was not near enough to hit the defendant's hand at the time the defendant shot him.

Rhonda Ross testified that on August 1, 2005, she was living in the Boxwood residence with the victim; their daughter, Riara; her cousin, Sheretta Graffread; Graffread's friend Karen, nicknamed "Cookie"; and Cookie's three children. She said she and the victim heard a woman scream, left their bedroom, and discovered the defendant and Graffread in the hallway outside. She stated that she and the victim had previously told the defendant and Graffread that the defendant was not welcome in their home and, on this occasion, once again told him to leave. The defendant went

outside, and they followed. After the defendant and the victim argued in the yard, the defendant began walking away, but he and the victim were still "throwing words back and forth at each other" as he left. The last thing she heard the defendant say was, "[M]an, you don't know me very well. I will come back and wet this place up."

Ross testified that she interpreted the defendant's words as a threat to come back and start shooting, but she did not take him seriously. A little later, however, she went into the house and saw Graffread on the telephone and Cookie placing all four children in the dry bathtub, which she found unusual. She went back outside and informed the victim, but neither of them believed the defendant would really do anything. She said that she and the victim had been visiting with a neighbor in the front yard for approximately thirty to forty-five minutes when she saw the defendant walking up the sidewalk toward their house. The defendant came through the front gate, and the victim got up and met him. She noticed nothing unusual about the defendant's appearance and assumed he had come back to work things out with the victim. The next thing she knew, however, the defendant shoved the victim and then pulled a gun out of his pants and shot him. The defendant put the gun back in his pants, looked at them, and ran down the street.

Ross testified that her mother, her uncle, Howard, and her cousin later made her aware of threats and bribes that had been made in connection with her testimony. Specifically, she was informed that she, the victim, and their daughter would be killed if they testified against the defendant but would be "paid off" if they did not. On cross-examination she acknowledged that she had said in her statement to police that the defendant had first swung at the victim and the victim had blocked his blow.

Sheretta Graffread testified that Ross told her at some point on August 1, 2005, that she did not want the defendant, whom Graffread had been dating for a couple of weeks, in her home. When the defendant came to the door and called Graffread's name later that day, the victim came running and began cursing him. After the two men had exchanged words, Graffread and the defendant walked down the street, and she told him not come to the house anymore. He left and she returned to the house and was visiting with Cookie in a bedroom when she was interrupted by a telephone call from the defendant. Cookie left the room while she was talking to the defendant but came back later. She denied that she knew what Cookie was doing during the time she was gone. Next, Graffread heard a gunshot, which she said was not unusual for the neighborhood. Ross then came running inside, told her that the victim had been shot, and instructed her to call 9-1-1.

Graffread testified that she closed and locked the door but did not call 9-1-1 because she initially thought Ross was kidding. Also, she did not care if the victim had been shot and did not want to get involved. She said that she still did not comply when a hysterical Ross returned a second time and asked her again to call 9-1-1, but Cookie, who was still in the room, grabbed the telephone and made the call. Graffread acknowledged that she had remained in communication with the defendant and that their most recent conversation occurred only a few days before trial. She said the defendant made a threatening comment in that conversation about her testifying at trial, but she did not take him seriously because he was in jail.

Memphis Police Officer Ronald Weddle, who responded to the shooting, testified that the victim refused to provide any personal information other than his name. He acknowledged on cross-examination that the victim appeared both upset and angry, provided the wrong clothing description for the shooter, and said that "he was going to take care of it himself."

Carolyn Chambers, an employee of the Shelby County Sheriff's Department, testified that she worked in special operations monitoring and recording telephone calls made by inmates at the county jail. She identified three compact discs containing recordings of telephone calls the defendant had made from the jail, which were subsequently admitted into evidence and published to the jury.

The defendant elected not to testify and rested his case without presenting any proof. Following deliberations, the jury convicted him of both counts of the indictment, which the trial court then merged into a single conviction for attempted first degree murder. The judgments were entered on February 16, 2007, the defendant filed a motion for new trial on March 29, 2007, and the trial court overruled the motion by written order entered on March 30, 2007. Thereafter, on April 27, 2007, the defendant filed a notice of appeal to this court.

## ANALYSIS

As an initial matter, we note that the defendant's motion for new trial was untimely, which resulted in the untimely filing of his notice of appeal. Tennessee Rule of Criminal Procedure 33(b) provides that "[a] motion for a new trial shall be made in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Because the provision is mandatory, the time for filing a motion for new trial may not be extended. See Tenn. R. Crim. P. 45(b) (specifically excluding time for filing of a motion for a new trial from those time periods which the court may, in its discretion, extend); see also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). The thirty-day provision is jurisdictional, making the trial court's erroneous consideration of an untimely filed motion a nullity and preventing the defendant from raising on appeal any issues which should have been raised in the motion for a new trial. Martin, 940 S.W.2d at 569; Dodson, 780 S.W.2d at 780.

Unlike the untimely filing of the notice of appeal, this court does not have the authority to waive the untimely filing of a motion for new trial. State v. Givhan, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980); see also Tenn. R. App. P. 4(a). In this case, however, the defendant's sole issue on appeal concerns the sufficiency of the evidence, which is an issue that we may still consider despite his untimely motion for new trial. See State v. Boxley, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001). We, therefore, elect to waive the untimely filing of his notice of appeal and will consider the issue on its merits.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions

-4-

whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was found guilty of criminal attempt to commit first degree premeditated murder. First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2006). "Premeditation" is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Id. § 39-12-101(b).

The defendant concedes that there was some circumstantial evidence of premeditation but contends that it was not so overwhelming as to exclude any other reasonable hypothesis, including that his intent was only to injure the victim. In support, he points out that he and the victim engaged in a verbal and physical altercation prior to the shooting and that he fired only one shot, leaving the

scene without inflicting any further injuries despite the fact that his gunshot rendered the victim immediately helpless. The State disagrees, arguing there was sufficient circumstantial evidence from which a jury could find the existence of premeditation beyond a reasonable doubt.

We agree that the evidence was sufficient to establish premeditation. The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). The circumstantial evidence of premeditation must, however, be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). There are several factors that tend to evidence premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." Bland, 958 S.W.2d at 660.

Viewed in the light most favorable to the State, the evidence established that the defendant, angered by the victim's ordering him to leave the premises, threatened to come back and "wet this place up," a phrase which the victim's fiancée interpreted as a threat to return and start shooting. A short time later, he communicated something to his girlfriend by telephone that caused her friend to gather the household's children and place them together in a dry bathtub. When he returned to confront the victim, he appeared calm, causing the victim and his fiancée to believe that he had come to apologize. Instead, he shoved the victim, pulled a gun out of his pants, shot the victim, replaced the gun, looked at the victim and his fiancée, and then fled. Afterwards, he communicated threats and bribes to various witnesses in an effort to prevent their testimony or influence it in his favor. The fact that his bullet struck the victim in the hip instead of a vital organ in the torso, or that he shot the victim only once, is not enough to overcome the other elements establishing that his intent was to kill the victim. We conclude, therefore, that the evidence was sufficient to sustain the defendant's attempted first degree murder conviction.

## CONCLUSION

Having reviewed the evidence and found it sufficient to sustain the defendant's conviction, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE